711 A.2d 158

ADVENTIST HEALTHCARE MIDATLANTIC, INC.
d/b/a Washington Adventist Hospital, Inc. et al.

v.

SUBURBAN HOSPITAL, INC., et al.

No. 114, Sept. Term, 1997.

Court of Appeals of Maryland.

June 10, 1998.

Reconsideration Denied July 28, 1998.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This is a battle over administrative procedure. Two Washington metropolitan area hospitals—Suburban Hospital and Holy Cross Hospital—filed applications with the Maryland Health Resources Planning Commission for a certificate of need (CON) to establish and operate open heart surgery (OHS) units at their respective hospitals. A third area hospi-

tal, Washington Adventist Hospital, opposed those applications. Upon the recommendation of its Staff, the Commission summarily denied the applications on the ground that the existing State Health Plan showed an insufficient need for an additional open heart surgery unit in the Washington metropolitan area and that approval of the applications, or either of them, would therefore be inconsistent with that Plan.

The Circuit Court for Baltimore City, acting on petitions for judicial review filed by Suburban and Holy Cross, reversed that decision. The court concluded that the Commission erred in rejecting the applications as a matter of law, based solely on their inconsistency with the State Health Plan. The Commission was required, it held, to consider the applications on their merits and to consider the applicants' evidence of current need for OHS services in the Washington metropolitan area. Washington Adventist and the Commission noted appeals from the court's judgment, and we granted certiorari on our own initiative prior to argument in the Court of Special Appeals. We shall reverse.

## BACKGROUND

In response to the National Health Planning and Development Act of 1974, the General Assembly created an apparatus to prepare and implement a comprehensive State Health Plan for Maryland. See *S. Md. Hosp. v. Ft. Wash. Community Hosp.*, 308 Md. 323, 519 A.2d 727 (1987). That apparatus has changed over the years; it is now centered principally in the Commission and operates in accordance with Maryland Code, §§ 19–101 through 19–123 of the Health–General Article, and the regulations adopted pursuant to § 19–107 of that Article (Repl.Vol.1996).

The basic goal of the Legislature, expressed in § 19–102(a), was "to promote the development of a health care system that provides, for all citizens, financial and geographic access to quality health care at a reasonable cost." To meet that goal, the Legislature created the Commission and charged it, among other things, with (1) developing, adopting, and periodi-

cally updating a comprehensive State Health Plan, and (2) assisting in the implementation of that plan, in part through the legislatively-established CON program. Section 19–114(a) requires the Commission to adopt a State Health Plan at least every five years and to include within that plan, among other things, (1) the identification of unmet needs, excess services, and minimum access criteria, (2) an assessment of the financial resources required and available for the health care system, and (3) "[t]he methodologies, standards, and criteria for certificate of need review." Section 19–114(c) directs that "[a]nnually or upon petition by any person, the Commission shall review the State health plan and publish any changes in the plan that the Commission considers necessary...." Section 19–114(e) requires the Commission to include in the plan standards and policies that relate to the CON program. Those standards must address "the availability, accessibility, cost, and quality of health care," and are to be "reviewed and revised periodically to reflect new developments in health planning, delivery, and technology." *Id.*

The CON program is authorized and governed by §§ 19–115 through 19–121 and the regulations adopted by the Commission pursuant to § 19–115(c). Essentially, a CON is required before a person may develop, operate, expand, change, or invest capital in health care facilities or services, including an OHS service. § 19–115. Section 19–118(c)(1) requires that all decisions of the Commission on an application for a CON, except in emergency situations posing a threat to public health, "shall be consistent with the State health plan and the standards for review established by the Commission." Although the Commission is given the non-delegable duty to act on CON applications, it is authorized by § 19–118(d) to delegate to a committee of the Commission the responsibility for reviewing an application, holding a hearing on it, and making a recommendation to the Commission. The Commission may approve, approve with conditions, or deny the CON application on the basis of the committee's recommendation and the whole record before the Commission. Section 19–118(f) provides that, if a party or interested person requests an evidentiary

hearing with respect to a CON application, the Commission or its committee "shall hold the hearing in accordance with the contested case procedures of the Administrative Procedure Act."

The Commission has adopted a State Health Plan in the form of regulations found in COMAR §§ 10.24.07—17. The plan for OHS cardiac surgery and therapeutic catheterization services is incorporated by reference in § 10.24.17. The Commission has also adopted regulations governing the CON procedure. Each January and July, the Commission publishes in the MARYLAND REGISTER a schedule for conducting comparative and standard reviews of CON applications for designated services, by health service area. The schedule states the status of applicable need forecasts found in the State Health Plan and the dates for the receipt of letters of intent and applications. COMAR § 10.24.01.08 D. Persons desiring to apply for a CON first submit a letter of intent that must contain a brief description of the project, the quantity and types of beds or health services to be affected, and the jurisdictions in which the services will be provided. COMAR § 10.24.01.07 C. Upon receipt of a letter of intent, the Commission staff meets with the proposed applicant to discuss, among other things, Commission procedures for reviewing the application and any State Health Plan requirements that may affect the project. COMAR § 10.24.01.07 E. Within 180 days after filing the letter of intent, the person may file a formal application. After Staff review for technical compliance, the application is docketed.

COMAR § 10.24.01.08 G sets forth substantive criteria for review of an application. Subsection G. (3) provides, in relevant part, that "[a]pplications for Certificate of Need shall be evaluated according to all relevant State Health Plan standards, policies, and criteria" and that "[f]or purposes of evaluating an application under this subsection, the Commission shall consider the applicable need analysis in the State Health Plan." In furtherance of that requirement, COMAR § 10.24.01.10 C provides that, at any time after docketing an application, the Staff may move for summary decision to deny

an application "if the proposed project is inconsistent with one or more standards of the State Health Plan that make the project unapprovable."

As noted, the State Health Plan is, itself, in the form of regulations. The part dealing with OHS services, applicable in this case, became effective October, 1990. It was based on 1988 data, projected through the "target year" of 1993 "to account for the effect of preventive measures, advances in medicine and surgery, and other factors that might impact the need for cardiac surgery." The OHS plan was supplemented in January, 1996, although the supplement dealt only with exemptions for certain research projects and did not alter the standards, methodologies, or criteria applicable to OHS projects.

Section .07 of the plan (COMAR 10.24.17.07) sets forth a methodology, in both descriptive and mathematical form, for determining the projected need for adult cardiac surgery in the four health service areas of the State. For the Washington metropolitan area, consisting of Washington, D.C., and Calvert, Charles, Montgomery, Prince George's, and St. Mary's counties, the plan, using that methodology, showed a projected need for 1993 of 3,497 adult cardiac surgeries and an existing capacity within six hospitals in that area to perform 3,407 of those surgeries, producing a net projected unfilled need of 90. Those figures were set forth in an Appendix to the plan. COMAR 10.24.17 Appendix 3, Table 6. The plan stated that the need projections calculated by using that methodology "are those applied by the Commission in its Certificate of Need decisions," that no update of need projections would take place before September, 1992, and that "[p]ublished need projections remain in effect until the Commission publishes updated projections." COMAR 10.24.17.07 E. The plan also contained certain CON "Approval Policies," among which were:

"(1) *Identification of Need for Cardiac Surgery Programs.* Maximum need for cardiac surgery programs is identified using the need projection methodology in Regulation .07 of

this Chapter and is found in the Appendix to this Chapter or in subsequent updates published in the *Maryland Register*.

(2) *Minimum Net Need Identified.*

*Net need for cardiac surgery projected in a Regional Service Area is no less than 200 open heart surgery cases for an adult program....*"

(Emphasis added.) Because, for purposes of CON approval, net need was defined as a minimum of 200 cases annually and the projected deficiency in the Washington metropolitan area was only 90 cases, the plan would not allow another OHS program in that area.

On July 21, 1995, the Commission published its 1996 schedule for receiving and reviewing CON applications for various services, including OHS services for all areas of the State. For OHS services, two schedules were published. The first called for letters of intent to be filed by April 1, 1996, with an application deadline of June 7, 1996; the second called for letters of intent by September 9, 1996, with an application deadline of November 15, 1996. See 22 Md. Reg. 1181. The notice made clear that the burden of proving that an application meets the criteria for review rested with the applicant, and that:

"These review schedules are not solicitations by the Commission for Certificate of Need applications. The schedules do not indicate that the development of the services subject to Certificate of Need review are needed, or that Certificate of Need applications submitted for the services described will be approved by the Commission. The schedules merely provide an opportunity for applications to be submitted on a regularly scheduled basis."

The schedule pertaining to OHS services stated further that "[t]he State Health Plan projected need for Open Heart Surgery through 1993. In the absence of new need projections, the burden of proof that the services are needed rests with the applicant."

Suburban and Holy Cross Hospitals had been interested in creating an OHS service for some time and had, on previous occasions, filed letters of intent with the Commission. When informed, in 1994, that a revision of the OHS chapter of the plan was not contemplated that year, they elected not to proceed with an application at that time. Following the July, 1995 notice, however, letters of intent were filed by three hospitals Suburban, Holy Cross, and Southern Maryland Hospital Center. Washington Adventist Hospital intervened as an interested party. At a pre-application conference held on April 19, discussion was held on the problem presented by the fact that the existing plan (1) showed no need, under the Commission's approval policies, for additional OHS service in the Washington metropolitan area, but (2) was based on data and a target year that were out of date.

On May 17, 1996, William Dethlefs, the Commission's Director of Resource Development, wrote to the parties confirming those discussions. Mr. Dethlefs noted, by way of preface, that "important policy decisions, including need projections, should not be made in the context of a certificate of need review" and pointed out the COMAR provision that published need projections remain in effect until updated projections were published. He suggested two alternative approaches. The first, which he termed a "fast-track" approach, called for applying more recent data to the existing need projection methodology in order to generate new need projections, which could then be published in the MARYLAND REGISTER as a statement of policy. That process, he estimated, could be completed within 60 days. The second approach was to undertake a comprehensive revision of the OHS chapter of the plan through a formal planning process, which could take up to nine months to complete. Dethlefs said that he preferred the latter:

"In the eight years since the cardiac surgery and therapeutic catheterization chapter was written, a number of important technological and structural changes have occurred that impact on these services. For example, therapeutic catheterization and other medical interventions have come

into their own. Operative techniques on the horizon hold promise of revascularization surgery through laparoscopic surgery, and without the need for pump-oxygenators or extensive post-operative care. Changes in reimbursement methods and the emergence of managed care are impacting on how cardiac disease is created. For these reasons, we believe it is important to undertake a complete and thorough analysis of this plan chapter, including an examination of its need methodology."

Notwithstanding his preference for the comprehensive review, which he said he was recommending to the Commission, Mr. Dethlefs apparently intended to proceed on both tracks. Noting that the letters of intent received in April were valid for 180 days and that, using the "fast-track" approach, a revised schedule could be published in the summer, he waived the current deadline of June 7 for the filing of applications and advised that, if revised projections based on applying more recent data to the current methodology showed a projection of unmet need, the Commission could accept applications as a follow-up to the letters of intent already filed.

On July 19, 1996, the Commission published new schedules for CON review, updating and replacing the schedules published in July, 1995. See 23 Md. Reg. 1141. The 1996 schedule called for letters of intent to be filed by June 6, 1997, and stated, as the reason for the delay:

"The State Health Plan projected need for Open Heart Surgery through 1993. The need projections are currently being updated to bring to bear on the consideration of current Letters of Intent. The next scheduled date for receipt of Letters of Intent is intended to follow the publication of a new State Health Plan chapter governing approval of new Open Heart Surgery services, so these schedules may be revised in the Maryland Register if a new Plan chapter is not available before the first listed date of submission."

The 1996 notice seems somewhat inconsistent with the fast-track alternative suggested by Mr. Dethlefs, which apparently was still being pursued. On June 6, 1996, the Executive

Director of the Commission set a new due date for filing applications of 30 days following the completion of revised estimates, but not later than September 27, 1996. On September 16, 1996, Mr. Dethlefs informed the parties that the Commission Staff had analyzed available data on current and expected future utilization patterns of OHS services and that "[t]his analysis does not indicate sufficient need for a review of certificate of need applications for new open heart surgery services in Montgomery County and in the Southern Maryland region at this time." He therefore recommended against filing applications in accordance with the September 27 deadline but proposed that they be submitted in accordance with the 1996 published review schedule. That request was repeated at a meeting between the prospective applicants and the staff, held on September 23, at which the importance of obtaining data from hospitals in the District of Columbia was discussed.[1]

Southern Maryland Hospital acceded to that request. It informed the Commission that it would work with the Commission in its review and revision of the need projections and would not file a CON application at that time. Suburban Hospital initially took the same approach, but when advised that Holy Cross intended to file a CON application, it filed one as well. The applications themselves are not in the record before us. From the description of them given by the Commission Staff, it appears that Holy Cross was proposing two dedicated OHS operating rooms and a five-bed cardiovascular intensive care unit. The total estimated cost of the project would be $4,221,000, including $3,186,000 in capital costs. Suburban's application proposed a joint program with Johns Hopkins Hospital. Two dedicated operating rooms and a four-bed intensive care unit would be required. The cost of that project was estimated to be $1,805,020, including $1,555,-020 in capital costs.

---

1. Of the capacity of 3,407 cases shown for the Washington metropolitan area in the existing OHS chapter of the plan, all but 350 cases, attributable to Prince George's General Hospital, were handled by hospitals in the District of Columbia.

**114**

Acting pursuant to COMAR 10.24.01.10 C, supra, the Staff, after preliminary review, moved for a summary decision disapproving the applications on the ground that they were inconsistent with the projected need in the State Health Plan and were therefore unapprovable. The Staff's argument was simple and direct: the existing plan showed a net need of only 90 cases and, by Commission regulation (Approval Policy 2, codified in COMAR 10.24.17.05 C(2)), a minimum net need of 200 adult cases must be identified to support the establishment of a new program. The Staff called attention to the regulation providing that published need projections remain in effect until the Commission publishes updated projections, which it had not done.

Apart from that legal argument, the Staff attempted to respond in its motion to the point made by the hospitals in their applications that the existing projections were out of date and inaccurate and that, if current data were used, the projection would show an unmet need in the year 2000 of 1,105 cases. According to the Staff, the data used by the hospitals to arrive at that projection included pediatric, not just adult, cases and employed a definition of open heart surgery that differed from the definition used in the State Health Plan. The Staff iterated in its motion that, although the need projection in the existing plan was for a target year of 1993, actual utilization during 1994 and 1995 was below the projected use for 1993 and that, as a result, "it cannot be argued that the adopted SHP projection is no longer valid...." It contended that trends in the Washington metropolitan area had stabilized, that Prince George's Hospital, which began its OHS program in 1990, had not yet performed more than 100 cases annually, and that two hospitals in Alexandria and Arlington, Virginia (which were not in the service area under the Maryland State Health Plan but nonetheless drew patients from that area) had begun OHS programs in 1988–89 and had not achieved 200 cases annually. The Staff observed that cardiac surgery procedures were among the most expensive cases, that the Commission's policy had been to "develop a small

number of high volume programs to ensure optimal patient care," and that it had "avoided the proliferation of unneeded, low volume programs by approving additional capacity only when projected need, as established through the planning process in the SHP ... is sufficient to ensure that a new program can meet acceptable utilization levels."

More important than its challenge to the hospitals' data and calculations, according to the Staff, was the fact that the hospitals had not reviewed the underlying assumptions of the methodology used in preparing their estimates. The motion noted that, in updating need projections, the Commission had historically reviewed the underlying assumptions of the methodology employed based on current utilization patterns, advancements in medical practice, refinements in available data, and changes in financing. The methodology used in the current plan, it observed by way of example, relied on rates for coronary artery bypass grafts to project total OHS cases because there were at the time no separate codes for percutaneous transluminal coronary angioplasty. Those codes had since been refined, making it unnecessary to rely on bypass cases to predict total OHS cases.

Both hospitals responded to the Staff's motion for summary decision. Suburban argued (1) that, despite its inclusion of an express statement to the contrary, the July, 1995 published schedule essentially invited CON applications and thereby authorized the applicants to submit their own need projections, (2) that the Commission could not legitimately rely on the provision retaining in place published projections until superseded by new projections because in several other cases it had ignored that provision and granted CON applications in the face of existing projections of no additional need, (3) that it was inappropriate for the Staff to "prevent review of these applications simply because it failed to update the need projections or revise the need methodology on a timely basis," and (4) that the motion raised significant issues of fact, which required an evidentiary hearing to resolve.

Holy Cross also contended that summary decision was inappropriate, for much the same reasons given by Suburban.

It too regarded the July, 1995 published schedule as an invitation to submit CON applications, implying thereby a determination that such applications would be considered on their merits. A summary decision, it argued, was permissible only if the existing plan "absolutely preclude[s]" approval of the application, and that was not the case. It regarded the need projections in the plan as outdated and therefore inapplicable, and thus construed the plan as containing no valid need projection. In that circumstance, it argued, the Commission had to consider the need projection proposed by Holy Cross on the merits. It joined Suburban's argument that, in light of having granted several CON's for home health care services, notwithstanding that the State Health Plan showed no need for such additional services, the Commission was not entitled to rely on the notion that outdated need projections remained valid until updated by new published projections. That principle, it urged, applied only to current projections, not outdated ones.

Washington Adventist, as an interested party, supported the Staff's motion. Though recognizing that the OHS portion of the State Health Plan needed to be reevaluated and updated, it maintained that the health planning function should not be exercised through the CON procedure. It pointed out that a comparative review would have State-wide ramifications—that reviews of CON applications in other areas would "inevitably be governed by the principles established through the outcome of the CON review and not the health planning process." Suburban and Holy Cross, it complained, sought to use the CON process "to force the Commission to adopt as policy for the State the position that the current SHP methodology for OHS services must be updated without reevaluation or reexamination, or the publication of updated need projections," which is directly contrary to the Commission's regulations.

In accordance with its authorized practice, the Commission referred the applications to a "reviewer"—a Commission member who would act as a committee of the Commission. On February 11, 1997, the reviewer presented to the Commission his recommended decision that the Staff's motion be granted.

The principal basis of the recommendation was the argument made by the Staff—that the current State Health Plan showed no need for an additional OHS service in the Washington metropolitan area and that the need projections in the plan remained in effect until superseded by published updated projections. He rejected the argument that only current need projections remained in effect until superseded as being inconsistent with the plain language of the regulation.

The reviewer rejected as well the argument that the Commission had been inappropriately inconsistent by reason of its approval of numerous applications for home health services, pointing out several distinctions between the two situations. Medical literature, he declared, established a "strong correlation" between the volume of open heart surgeries performed and the quality of an OHS service, a correlation that was lacking with respect to home health services. Thus, he found, "it is far more important to carefully plan for OHS services and to guard against the approval of too many OHS programs than it is to plan for and guard against the approval of too many home health agencies." Moreover, home health services require a much smaller capital investment, and thus the negative impact on the public from a failed home health agency, in terms of both fiscal impact and patient health, was relatively small compared to the negative effect of a failed OHS service. Finally, he noted that the Commission had been flooded with over 100 applications for home health services and that, rather than put them all on hold while updating need projections that the Commission believed were probably inadequate, it established an alternative policy. He concluded:

"There is no inconsistency between the Commission's treatment of home health and its treatment of OHS. In the Home Health area, the Commission made a responsible decision not to hold pending applications hostage to antiquated need methodology, which it strongly suspected underestimated need, after weighing the risks and benefits to the public of adhering to that need methodology.

In the OHS area, that same weighing of the public risks and benefits strongly supports adhering to the Commis-

sion's current need projections until a new plan is completed and new need numbers are run. The potential detriment to the applicants—a few lost months of operating time—far outweigh the potential detriment to the public should the Commission erroneously approve an unneeded OHS application."

Suburban and Holy Cross each filed exceptions to the reviewer's recommendation, largely for the reasons cited in their applications. Suburban urged that refusal to proceed with an evidentiary hearing in the face of outdated projections would be arbitrary, capricious, and in violation of due process, that the published projections, being outdated, cannot lawfully remain in effect, that the proposed decision failed to explain the inconsistency between the action taken in the home health care cases and in two rehabilitation hospital cases and the proposed action in the OHS cases, and that an inference of no additional need cannot be properly drawn from Staff's failure to update the projections. In different language, Holy Cross made essentially the same points, although it added the fact that, because Prince George's Hospital never performed more than 79 OHS cases, the existing projection for the Washington metropolitan area, which assumed 350 cases for that hospital, was inaccurate, and that the need, even under the existing plan, would be at least 364 cases.[2] Washington Adventist filed a response to the exceptions, urging that they be overruled. The Commission granted the motion and denied the applications on February 11, 1997, following which Suburban and Holy Cross sought judicial review.

On June 18, 1997, the court filed a memorandum opinion and order reversing the Commission's "Opinion" and remanding the matter for the Commission to review the applications on their merits. The court found two legal errors in the

---

**2.** It is not clear how Holy Cross came up with 364. The hospital apparently intended to subtract the 79 cases from the 350 allotted to Prince George's Hospital (271) and add to that the 90 net need shown in the plan, which would produce only 361. The point is the same with either number.

Commission's summary decision. First, it held that the need projections in the State Health Plan were "an insufficient basis on which to deny applications as a matter of law"—that they were "not so legally conclusive as they would need to be to use them as a sole basis on which to render the applications inconsistent with the SHP." It concluded that "[t]he Commission may not, as a matter of law, refuse to review the applications on their merits based on published need projections." Second, the court was disturbed by what it regarded as the inconsistent positions taken by the Commission, approving home health service applications despite the existing plan showing no need for them but refusing even to consider the OHS applications on that same basis. The distinctions offered by the Commission, it declared, might justify denying the applications on their merits, but they did not justify disposing of them by summary decision.

On August 15, 1997, the Commission published notice that on June 10, 1997, it had adopted a proposed new chapter of the State Health Plan for OHS services. Among the purposes of the new plan, it said, were the establishment of updated policies and standards for cardiac surgery and therapeutic catheterization services and the provision of a new methodology for projecting the need for cardiac surgery services. The Commission stated its intent to use the new chapter "to guide pending Certificate of Need reviews for cardiac surgery programs." 24 Md. Reg. 1234. On November 11, 1997, the Commission published notice of its adoption of the new chapter, essentially as proposed, in the form of a regulation to be codified in COMAR § 10.24.17. 24 Md. Reg. 1670. The new chapter, which was based on 1994–96 data and calculated net need for the target year 1999, was to become effective December 1, 1997. The plan showed a projected adult cardiac surgery caseload for the Washington metropolitan area of 3,858, but an existing capacity among the six area hospitals offering that service of 6,500, indicating an overcapacity of 2,642, and therefore no need for any new OHS service.[3]

---

**3.** The issue of whether the adoption of updated need projections showing no current need for additional OHS service in the Washington

## DISCUSSION

### Standard of Review

 A court's role in reviewing contested case decisions made by administrative agencies "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised on an erroneous conclusion of law." *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994). As noted in *Insurance Com'r for the State v. Engelman,* 345 Md. 402, 411, 692 A.2d 474, 480 (1997):

> "This standard of review is both narrow and expansive. It is narrow to the extent that reviewing courts, out of deference to agency expertise, are required to affirm an agency's findings of fact, as well as its application of law to those facts, if reasonably supported by the administrative record, viewed as a whole [citations omitted]. The standard is equally broad to the extent that reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law."

### Analysis

The case before us presents issues that underlie other issues and does not fall neatly and exclusively into either the area of fact-finding or the area of law determination. In adopting the reviewer's recommended decision, the Commission exercised all three functions—it decided certain facts and it determined and applied principles of procedural and sub-

---

metropolitan area rendered these appeals moot was raised at oral argument. The new projections were challenges by Suburban on the ground that in adopting them the Commission violated the State Open Meetings Law (Maryland Code, Title 10, Subtitle 5 of the State Government Article (Repl. Vol. 1995)). Although the Circuit Court for Baltimore City apparently found no violation and rendered judgment against Suburban, the issue is currently pending in the Court of Special Appeals on Suburban's appeal from that judgment. Because the validity of the new published projections is still in litigation, their adoption does not render this appeal moot. See *Baltimore City v. Princeton Co.,* 229 Md. 176, 182 A.2d 803 (1962).

stantive law, but mostly it exercised its expertise and judgment in applying the law to the facts.

The sole issue addressed by the circuit court on judicial review was a procedural one—whether the Commission properly dismissed the applications by summary decision, without considering the need projections and other evidence sought to be presented by the applicants. As noted, COMAR § 10.24.01.10 C(1) permits the Staff to move for summary decision to deny a docketed CON application "if the proposed project is inconsistent with one or more standards of the State Health Plan that make the project unapprovable." Although the regulation speaks only in terms of the ground for a motion, the same standard necessarily governs the Commission's granting of the motion; *i.e.*, the Commission may deny an application by summary decision only upon a finding that the project is inconsistent with a State Health Plan standard and, for that reason, is unapprovable. The validity of the summary decision regulation and procedure is not challenged by Suburban or Holy Cross; their complaint deals only with its application in this case.

■ As we indicated, the statute governing CON proceedings, § 19–118(c)(1), requires that, except in an emergency situation, all decisions of the Commission on CON applications "shall be consistent with the State health plan and the standards for review established by the Commission." That direction is also in the Commission's regulations. See COMAR § 10.24.01.08 G, *supra*, requiring the Commission, in evaluating CON applications, to "consider the applicable need analysis in the State Health Plan." The existing plan showed a net need in the Washington metropolitan area of only 90 cases and required a minimum of 200 cases to justify a new OHS program. Facially, therefore, the applications were inconsistent with the existing plan and, accordingly, were unapprovable.

The attack leveled by the two hospitals was not on whether the Staff or the Commission misinterpreted the plan, but challenged instead the validity and applicability of the plan

itself. They contended that the data upon which the need projections were based was out of date and that, as a result, the need projections shown in the plan were legally invalid and factually incorrect. Their legal point was that the statute— § 19–114(a)—required the plan to be updated every five years, that the target year to which the need projections pertained was 1993, and that need projections for past years could not lawfully be used to bar consideration of more recent (and in their view more reliable) evidence of need. They sought to establish that the net need shown in the plan was, in fact, incorrect, and that a much greater need actually existed. They rejected the Commission's reliance on COMAR § 10.24.17.07, providing that published need projections remain in effect until the Commission publishes updated projections, on the grounds that (1) that provision applied only to current need projections, not outdated ones, and (2) even if it applied to outdated projections, the Commission was barred from relying on that provision because the Commission had not applied the provision consistently.

When properly distilled, these arguments, though having factual and judgmental underpinnings, present essentially one legal issue—whether it is appropriate to use a CON contested case proceeding to determine the validity and applicability of the published need projections contained in the existing State Health Plan. We shall answer that question in the negative.

The comprehensive health planning law embodied in §§ 19–101 through 19–123 vests a number of general and specific powers and duties in the Commission, but most of them relate to or are in aid of two paramount functions—developing, adopting, and periodically reviewing and updating a comprehensive State Health Plan, and assisting in the implementation of that plan, principally through the CON process. The development, adoption, and updating of the plan is a quasi-legislative function. Section 19–114(d) requires that the Commission adopt regulations "that ensure broad public input, public hearings, and consideration of local health plans in

development of the State health plan." That kind of input is required as well by the Administrative Procedure Act. Because the plan is adopted as a regulation (and any changes to it are therefore amendments to a regulation), the Commission, in adopting or amending the plan, must comply with the applicable procedures set forth in Title 10, Subtitle 1 of the State Government Article (1995 Repl.Vol.)—submission of the proposal to the General Assembly's Joint Committee on Administrative, Executive, and Legislative Review, publication of notice in the MARYLAND REGISTER, allowance of at least 30 days for public comment, opportunity for comment, either through a public hearing or through telephonic communication, and published notice of final adoption. *See* §§ 10–110 through 10–113 of the State Government Article. As part of that process, the legislative Joint Committee may delay adoption of the regulation or amendment, and, if it registers formal opposition, the regulation or amendment may not be adopted without the Governor's approval. *See* § 10–111.1.

Those procedures are designed, on the one hand, to afford fair notice and a meaningful opportunity to comment to all persons who may be affected by the proposed regulation and, on the other, to give the agency free-flowing information from a broad range of interests, including the Legislature and the Governor. They are peculiar to a quasilegislative process in which the end result is not the adjudication of individual rights but the promulgation of public policy.

■ The CON process is quite different. It is a quasi-judicial process, in which individual rights, duties, entitlements, or privileges are at issue. That is why the law requires that it be conducted as a contested case, subject to the procedural protections afforded by title 10, subtitle 2 of the State Government Article, rather than the public notice and information-gathering procedures mandated by title 10, subtitle 1 of that Article. The end result is an adjudication, containing findings of fact, conclusions of law, and an order. *See* § 10–221. As we indicated, those findings of fact can be reviewed by a court to see if they are based on substantial

evidence; the conclusions of law can be reviewed for procedural and substantive correctness. That is not the case with respect to quasi-legislative declarations of policy achieved through the adoption of regulations. When an agency acts in that manner, "the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries." *Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 224, 334 A.2d 514, 524 (1975).

As the Staff, in its motion, and the Commission, in its decision, made clear, the CON process is not the appropriate way to correct, amend, or update the State Health Plan, which is essentially what Suburban and Holy Cross sought to do. They wanted to produce evidence that there was a net need in the Washington metropolitan area for additional OHS service and that, because the 90–case need shown in the plan was no longer valid, the Commission was obliged to make a finding in the CON proceeding of a new net need, to replace that shown in the plan. Holy Cross proposed to show that net need by applying the methodology used in the existing plan to what it regarded as relevant updated data.[4] That attempt, however, both ignored and was inconsistent with the Commission's historical approach, when updating the plan, of reexamining the methodology itself and the assumptions underlying that methodology. The point was made, and needed to be considered, that a number of important changes had occurred since the existing plan was developed that cast some doubt on the continuing reliability of the methodology used in it—the refinement of angioplasty codes, new financing and reimbursement structures and methods, for example.

That prospect alone demonstrates the substantive inappropriateness of using the CON contested case procedure in this instance. Even if the data offered by the hospitals was accepted as correct (and, as noted, their data was disputed by

---

**4.** *See* Brief of Holy Cross at 18: "In its application, Holy Cross projected the future need for these services (for the year 2000) using the methodology set forth in the Cardiac Surgery Chapter and the most recent data available."

the Staff), the issue would still be generated of whether the methodology applied to that data remained valid. If the methodology or the assumptions on which it was based also were out of date, the Commission would need to consider what new methodology or assumptions should be applied in order to produce reliable projections. It is not entirely clear whether Suburban's proposed projections involved a new or alternative methodology, but, even if they did, a CON contested case proceeding is not the appropriate vehicle for determining methodology. That is an investigative and evaluative process, quasi-legislative in nature, the outcome of which will have State-wide effect. More important, in a legal sense, is the fact that the substitution of a new net need for that stated in the current plan would necessarily constitute a change in the plan. Because the plan was in the form of a regulation, however, such a change would have to be made in conformance with Subtitle 1 of the Administrative Procedure Act, and that simply cannot be done through a contested case proceeding. The Commission could not be expected to send a proposed CON decision adopting a new net need to the legislative Joint Committee for its review, to publish notice of it in the Maryland Register for comment, or to withhold adopting the decision until after the opportunity for public comment. It could never have been intended that the Governor have the right to approve or reject a CON determination upon objection by the legislative Joint Committee.

Inapplicability of a CON procedure in this setting does not leave hospitals or others without a remedy. Indeed, the law provides two alternative remedies especially suited to redress the kind of complaint made by Suburban and Holy Cross. One is in the comprehensive health planning law itself. Section 19–114(c) provides that "[a]nnually *or upon petition by any person*, the Commission shall review the State health plan and publish any changes in the plan that the Commission considers necessary, subject to the review and approval granted to the Governor under this subtitle."[5] (Emphasis added.)

---

5. Section 19–110(c) gives the Governor certain approval and revisory authority over changes to the State Health Plan.

To the extent that the Commission, in the hospitals' view, was laggard in updating the OHS chapter of the State Health Plan, they could have lit the appropriate fire through a petition under § 19–114(c).

The second approach lies under the Declaratory Judgment Act. Maryland Code, § 3–406 of the Courts and Judicial Proceedings Article (Repl.Vol.1995), permits any person whose rights, status, or other legal relations are affected by a statute or regulation to have a circuit court determine any question of construction or validity arising under the statute or regulation and declare the person's rights, status, or other legal relations under the statute or regulation. The point sought to be made by the hospitals—that the need projections in the current plan cannot be applied to preclude CON review either because they are invalid or because the Commission had not applied plan projections in a consistent manner—could be raised in a Declaratory Judgment proceeding, at least if a petition under § 19–114(c) proved unsuccessful. If the court were to agree with the hospitals, it would be required to enter an appropriate declaratory judgment holding that part of the plan inapplicable.

In a case close in point, the Pennsylvania Commonwealth Court reached the same result we do—that a CON proceeding is not the proper mechanism for invalidating, declaring inapplicable, or modifying parts of the State Health Plan. In *Dept. of Health v. North Hills Hosp.*, 674 A.2d 1141 (Pa. Commw.Ct.1996), the State Health Plan showed a need for two additional OHS services in a particular region. Three hospitals filed CON applications. Although all three met the statutory criteria and qualitative requirements, the State Health Department approved the two located in a part of the region not currently having an OHS service, to provide better accessibility for people in that area. The third applicant, among other things, challenged the need projections in the plan, contending that the formula used to determine the need improperly relied on general population figures rather than adult population figures. The Board of Health, which acted as an administrative appellate body, found merit in the hospital's

argument and ordered the Department to grant a third CON. On the Department's petition for judicial review, the court reversed, holding, in relevant part, that the State Health Plan was to be treated as a regulation that could be challenged only as other regulations may be challenged, and that the Board therefore exceeded its authority "in addressing [the hospital's] challenge to the need formula set forth in the State Health Plan in the context of [the hospital's] CON appeal." *Id.* at 1147.

For the reasons noted, we conclude that the circuit court erred in reversing the decision of the Commission. The applications, as submitted, were inconsistent with the State Health Plan and, for that reason, were unapprovable. To the extent approval would require the substitution of a new net need for OHS service in the Washington metropolitan area, that substitution would have to be made through an updating of the plan in accordance with the procedures applicable to such a process, not as part of a CON contested case proceeding. Summary decision was therefore appropriate.

JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT AFFIRMING ORDER OF COMMISSION; APPELLEES TO PAY THE COSTS.